

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-25-2004

# In Re: Adams Golf

Precedential or Non-Precedential: Precedential

Docket No. 03-3945

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"In Re: Adams Golf " (2004). *2004 Decisions.* Paper 352.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/352

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT
OF APPEALS FOR THE
THIRD CIRCUIT

No. 03-3945

IN RE: ADAMS GOLF, INC.
SECURITIES LITIGATION

F. KENNETH SHOCKLEY, M.D.;
DAVID SHOCKLEY;
TODD TONORE;
ZANE BIANACCI;
PATRICIA CRAUS;
TERRY LINVILLE;
LARRY PRICE;
FEDERATED NATIONAL
INSURANCE COMPANY, on behalf
of all others similarly situated,
                    Appellants

Appeal from the United States
District Court for the
District of Delaware
(D.C. Civil Nos. 99-cv-0371,
99-cv-0397, 99-cv-0421,
99-cv-0469, 99-cv-0498,
99-cv0-511, 99-cv-0618)
District Judge: Honorable Kent Jordan

Argued May 25, 2004

Before: SCIRICA, Chief Judge,
RENDELL and ALARCÓN*,
Circuit Judges.

(Filed: August 25, 2004)

Elizabeth W. Fox
Todd S. Collins     [ARGUED]
Berger & Montague
1622 Locust Street
Philadelphia, PA  19103
   *Counsel for Appellants*

Kevin G. Abrams
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE  19899

Michael J. Biles
Jennifer R. Brannen
Jesse Z. Weiss
Paul R. Bessette     [ARGUED]
Kevin G. Abrams
Akin, Gump, Strauss, Hauer & Feld
300 West Sixth Street, Suite 2100
Austin, TX  78701
   *Counsel for Appellees Adams Golf Inc.,*
   *B.H. Adams, Richard H. Murtland,*
   *Darl P. Hatfield, Paul F. Brown, Jr.*
   *Roland E. Casati, Finis F. Conner,*
   *and Stephen R. Patchin*

Robert K. Payson
Potter, Anderson & Corroon
1313 North Market Street
6th Floor, P.O. Box 951
Wilmington, DE  19801

   *Honorable Arthur L. Alarcón, Senior
Judge, United States Court of Appeals for
the Ninth Circuit, sitting by designation.

Michael J. Chepiga    [ARGUED]
Simpson, Thacher & Bartlett
425 Lexington Avenue
New York, NY 10017
  *Counsel for Appellees Lehman Bros.*
  *Holdings, Banc of America Securities*
*LLC, and Ferris Baker Watts*

OPINION OF THE COURT

RENDELL, Circuit Judge.

In this securities case, plaintiff-shareholders brought an action under the Securities Act of 1933 against Adams Golf, Inc., a manufacturer of golf equipment, and certain of its officers and underwriters. The plaintiffs contended that the Company's registration statement and prospectus contained materially false or misleading statements in violation of sections 11, 12(a)(2), and 15 of the Securities Act. Among other things, Adams Golf's public offering materials indicated that the Company sold its golf equipment exclusively to authorized retailers and that the golf industry was flourishing. In their complaint, the plaintiffs alleged that Adams Golf omitted information contrary to these representations, i.e., that unauthorized retailers were selling Adams Golf's golf clubs, and that retailers industry-wide were carrying an oversupply of golf equipment. Finding that neither the unauthorized retail nor the oversupply allegations stated a claim upon which relief could be granted,

the District Court dismissed the action under Fed. R. Civ. P. 12(b)(6). *In re Adams Golf, Inc. Sec. Litig.*, 176 F. Supp. 2d 216 (D. Del. 2001). For the reasons that follow, we will affirm in part and reverse in part.

I

A

When Barney Adams founded Adams Golf in 1987, the Company was a golfing components supplier and a contract manufacturer. Over the years, it grew to become a designer and manufacturer of its own custom-fit golf clubs. After having much success by introducing a high-end golf club, called Tight Lies, the Company offered its shares to the public. On July 10, 1998, an Initial Public Offering ("IPO") of 5,575,000 shares of the Company's common stock was made at $16 per share, accompanied by the requisite registration statement and prospectus.[1]

---

[1]Originally, the plaintiffs in this action consisted of those who purchased directly from the defendant-underwriters during the IPO and those who purchased their shares from the secondary market soon after the IPO. Citing to *Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995) and *Ballay v. Legg Mason Wood Walker, Inc.*, 925 F.2d 682 (3d Cir. 1991), the District Court held that the plaintiffs who purchased Adams Golf shares on the public market did not have a private right of action under section 12(a)(2) of the

2

In their complaint, the plaintiffs contend that the defendants misrepresented and omitted material facts in the registration statement and prospectus. First, the plaintiffs argue that the defendants failed to disclose that its revenues were artificially inflated by a "gray market" distribution of Adams Golf golf clubs. Second, the plaintiffs argue that the defendants failed to disclose the existence of an industry-wide oversupply of golf equipment. The facts with respect to these two sets of allegations will be explored in more detail.

1

Adams Golf sold its golf clubs only to authorized dealers. As its registration statement explained:

> To preserve the integrity of its image and reputation, the Company limits its distribution to retailers that market premium quality golf equipment and provide a high level of customer service and technical expertise. . . . The Company believes its selective retail distribution helps its retailers to maintain

profitable margins and maximize sales of Adams' products.

The registration statement made clear that, as part of its limited distribution arrangement, the Company "does not sell its products through price sensitive general discount warehouses, department stores or membership clubs."

Prior to the IPO, however, Adams Golf had learned that Tight Lies golf clubs were being sold by Costco, a discount warehouse. On June 9, 1998, one month before the registration statement's effective date, the Company issued a press release in which it acknowledged that an unauthorized dealer was selling its signature product. Indeed, the plaintiffs alleged that prior to the IPO, Costco possessed over 5,000 Tight Lies clubs in its inventory. In the press release, Adams Golf stated it was "concerned" about Costco's sale of the golf clubs "because Costco [was] not an authorized distributor." Concerned enough that, according to the press release, Adams Golf initiated legal proceedings, by filing a bill of discovery against Costco, to determine "whether Costco's claims that they had properly acquired Adams' Tight Lies fairway woods for resale were accurate." The plaintiffs further alleged that the unauthorized distribution was not limited to Costco and included "sales by other unauthorized discount retailers and international gray market distributors."

This unauthorized inventory created

---

1933 Act. However, the District Court ruled that those secondary market purchasers could sue under section 11 of the Act. These determinations have not been challenged by the parties and so we do not pass upon them.

a "gray market," according to the plaintiffs. The complaint defines "gray market" to simply refer to "the unauthorized distribution of the Company's products to discount retailers." The complaint sets out the several ostensible consequences of this gray market. The plaintiffs alleged that the Company initially experienced a rise in sales as products were diverted to the unauthorized distributors. According to their complaint, "[t]he short-term income generated by sales to the gray market also skewed the Company's overall financial appearance, creating the false impression of heightened sales and profitability at the time of the IPO, according to the historical financial statements contained in the Registration Statement and the Prospectus." Seeking a better deal, consumers bought their Tight Lies clubs from cheaper, unauthorized sources. With their sales diminished, authorized dealers then reduced their orders for Adams Golf equipment. In time, the ultimate result for the Company was an overall drop in revenue.

About five months after the IPO, on January 7, 1999, Adams Golf issued a press release anticipating disappointing fourth quarter 1998 results. The Company stated that sales would continue to suffer as a result of the "gray market distribution of its products to a membership warehouse club." Further, according to the plaintiffs' complaint, Adams Golf acknowledged, in its Form 10-K filed in March of 1999, that despite its best efforts, a membership warehouse club had possession of its golf clubs, and that the Company "does not believe that the gray marketing of its product can be totally eliminated."

2

The complaint also states that by omitting any mention of an industry-wide glut of golf equipment carried by retailers, certain passages in Adams Golf's registration statement were materially misleading. Specifically, the plaintiffs refer to the statement that "[t]he Company believes its prompt delivery of products enables its retail accounts to maintain smaller quantities of inventory than may be required with other golf equipment manufacturers." Further, the plaintiffs argue that forward-looking statements contained in the offering materials, including the belief that "a number of trends are likely to increase the demand for Adams' products" painted too rosy a picture of the golf industry, particularly in light of the problem of retail oversupply.[2]

---

[2]In particular, the offering materials indicated that:

> In 1997, wholesale sales of golf equipment in the U.S. reached an estimated $2.4 billion. Wholesale sales of golf clubs increased at an estimated compound annual growth rate of approximately 13% over the 5-year period from 1992-1997. The Company believes that a number of trends are likely to further increase the demand for Adams' products. These trends include: (i) significant

4

The record indicates that oversupply did eventually come to adversely affect Adams Golf's bottom line. Indeed, the first quarter report for 1999 indicated that the Company had suffered disappointing financial results, partly owing to an "oversupply of inventory at the retail level, a condition that weakened club sales industry wide over the last 12 months, [and] has resulted in substantial reductions in retailer purchases."

B

The District Court granted the defendants' motion to dismiss for failure to state a claim upon which relief may be granted. *Adams Golf*, 176 F. Supp. 2d at

---

growth in the number of golf courses; (ii) increasing interest in golf from women, junior, and minority golfers; (iii) the large numbers of golfers entering their 40s and 50s, the age when most golfers begin to play more often and increase their spending on the sport; (iv) the correspondingly large population of 'Echo Boomers,' who are beginning to enter their 20s, the age of when golfers generally take up the sport; and (v) the rapid evolution of golf club designs and materials.

238. The Court ruled as to both the gray market and the retail oversupply claims that Adams Golf's registration statement contained neither false, nor misleading statements, nor any material omissions. In response, the plaintiffs filed a motion to amend its complaint pursuant to Fed. R. Civ. P. 59(e) and 15, which the District Court denied in a subsequent order. The plaintiffs timely appealed both rulings of the District Court. We have jurisdiction to consider this appeal pursuant to 28 U.S.C. § 1291.

II

This Court reviews Rule 12(b)(6) dismissals *de novo*, accepting all well-pleaded allegations as true and drawing all reasonable inferences in favor of plaintiffs. *Anthony v. Council*, 316 F.3d 412, 416 (3d Cir. 2003). We may not affirm unless we are certain that no relief could be granted under any set of facts which could be proven. *Id.* The District Court concluded that the plaintiffs' complaint was insufficient to state a claim against the defendants under sections 11 and 12(a)(2) of the 1933 Act.[3]

---

[3]Plaintiffs also brought claims under section 15 of the 1933 Act. A form of derivative liability, section 15 permits investors to recover, on a joint and several basis, from "control persons" who would be otherwise liable under sections 11 and 12(a)(2). 15 U.S.C. § 77o. But because the District Court dismissed the sections 11 and 12(a)(2) claims, it did not, nor need

The 1933 Act creates federal duties, particularly involving registration and disclosure, in connection with the public offering of securities. Sections 11 and 12(a)(2) impose civil liability for the making of materially false or misleading statements in registration statements and prospectuses. *See* 15 U.S.C. §§ 77k, 77*l*(a)(2). In particular, section 11 involves material misstatements or omissions in registration statements, while section 12(a)(2) involves prospectuses and other solicitation materials.

To state a claim under section 11, plaintiffs must allege that they purchased securities pursuant to a materially false or misleading registration statement.[4] *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983) ("If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case."); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 286 (3d Cir. 1992).[5] To state a claim under section 12(a)(2), plaintiffs must allege that they purchased securities pursuant to a materially false or misleading "prospectus or oral communication."[6] The plaintiffs

---

we, consider any issues related to control person liability.

[4]Section 11 provides a right of action to purchasers:

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading . . . .

15 U.S.C. § 77k(a).

---

[5]The requirements under section 11 stand in stark contrast to those of the Securities Exchange Act of 1934 (the "1934 Act"), which include a showing of reasonable reliance and scienter. Further, unlike claims brought under the anti-fraud provisions of the 1934 Act, claims under the 1933 Act that do not sound in fraud are not held to the heightened pleading requirements of Fed. R. Civ. P. 9(b). *Shapiro*, 964 F.2d at 288. Applying *Shapiro*, the District Court determined that the plaintiffs' complaint did not sound in fraud, a ruling that has not been cross-appealed by the defendants. Additionally, the District Court observed that the stringent pleading requirements imposed by Congress in the Private Securities Litigation Reform Act of 1995 apply to the 1934 Act alone. The District Court accordingly ruled that the plaintiffs' complaint was subject only to the liberal notice pleading standard of Fed. R. Civ. P. 8.

[6]Section 12(a)(2) provides that any defendant who:

> offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact

argue that both their claims concerning the gray market distribution and the existence of a retail oversupply meet the above pleading minima. Further, they contend that the District Court improperly denied their motion to amend the complaint, which they filed pursuant to Fed. R. Civ. P. 59(e) (motion to amend or alter the judgment) and Fed. R. Civ. P. 15 (motion to amend the pleadings). We consider each set of claims in turn.

A

The plaintiffs alleged that by omitting any mention of what they characterize as a gray market problem, Adams Golf rendered the registration statement false or misleading, specifically those claims concerning the Company's reliance on a network of authorized distributors. The District Court found that

---

necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable . . . to the person purchasing such security from him . . . .

15 U.S.C. § 77*l*.

Costco's unauthorized possession of golf clubs did not constitute a material omission.[7] *Adams Golf,* 176 F. Supp. 2d at

---

[7]In addition to materiality, the District Court required the plaintiffs to show that an omission or misstatement was known to the Company at the time of the IPO. *Adams Golf*, 176 F. Supp. 2d at 233 ("While the plaintiffs build their case around Adams Golf statements appearing after the IPO date, in order to state a claim for material omission, the plaintiffs [sic] allegations must identify that this alleged undisclosed material risk was *known* and material at the time of the IPO." (emphasis supplied)). This is not correct. Sections 11 and 12(a)(2) are virtually absolute liability provisions, which do not require plaintiffs to allege that defendants possessed any scienter. *Huddleston*, 459 U.S. at 382. As this Court has held:

There are substantial differences between the elements a plaintiff must establish under § 10 and Rule 10b-5 of the Securities Exchange Act of 1934 and under §§ 11 and 12(2) of the Securities Act of 1933. Under the former, the plaintiffs must plead not only that the defendants made material omissions and/or misrepresentations, but also that they reasonably relied on them and that the defendants acted with knowledge or recklessness. In contrast, §§ 11 and 12(2) impose no such requirements.

*In re Donald J. Trump Casino Sec.*

7

234 ("In sum, plaintiffs have not alleged support for their proposition that the fact that an unauthorized discount retailer had illegally obtained a number of Adams Golf clubs constituted a material risk at the time of the IPO, or a 'known trend' threatening the Company's future sales, that should have been disclosed."). Further, the Court determined that, in any event, the omission of any information regarding the gray market did not render the registration statement and prospectus false or misleading.

Materiality is ordinarily an issue left to the factfinder and is therefore not typically a matter for Rule 12(b)(6) dismissal.[8] *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 317 (3d Cir. 1997) ("[T]he emphasis on a fact-specific determination of materiality militates against a dismissal on the pleadings."). "Only if the alleged misrepresentations or omissions are so *obviously unimportant* to an investor that

---

*Litig.-Taj Mahal Litig.*, 7 F.3d 357, 369 n.10 (3d Cir. 1993) (internal citations omitted).

[8]The standard test in securities law to determine the materiality of an omission is "whether there is a 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law." *Shapiro*, 964 F.2d at 281 n.11 (citing *TSC Indus.*, 426 U.S. at 450) (emphasis added). Although the District Court did not expressly reference this standard, its dismissal for failure to state a claim was proper only if the gray market and retail oversupply issues were plainly unimportant to a reasonable investor.

To support its determination that the gray market claim lacked materiality, the District Court observed that Costco possessed what it considered a "limited number" of golf clubs at the time of the IPO. The defendants explain that these were 5,000 golf clubs out of 235,000, or roughly two percent of the golf clubs sold by Adams Golf that fiscal quarter. By itself, however, this figure does not persuade us that the fact was plainly immaterial. Were Costco to have had more than ten percent of the Company's golf clubs in its inventory, we might agree that the unauthorized inventory would be undoubtedly material. To illustrate the other extreme, if a discount retailer had just a handful of golf clubs, we might conclude that a few errant fairway woods would be obviously immaterial to a reasonable investor. In contrast, the materiality of Costco's unauthorized inventory of several thousand Adams Golf golf clubs cannot be so easily divined. In order to make the "delicate assessments" involved in a materiality determination, *Shapiro*, 964 F.2d at 281 n.11, we would

need more information regarding, for example, the importance of the limited distribution arrangement to Adams Golf's business model and, perhaps, the nature of the golf club industry more generally. In a tightly competitive market, the maintenance of exclusivity among Adams Golf's network of authorized dealers may have been vital, and the Company's touting this mode of distribution seems to imply that it is. Indeed, in its registration statement, the Company indicated that its distribution system allowed it "to maintain profits and maximize sales of Adams Golf products." In light of such considerations, the possession of 5,000 golf clubs in the hands of a nationwide, discount retailer may have been material, since it may have "altered the 'total mix' of information" available to a reasonable investor. *NAHC*, 306 F.3d at 1331. But without further factual development, the answer to this materiality inquiry is far from plain.

The District Court also reasoned that the gray market problem was immaterial because it was an "isolated incident" and not part of a "known trend." *Adams Golf*, 176 F. Supp. 2d at 234. But a fact need not be part of a pattern to be material. Even isolated incidents can result in immediate and negative consequences for a company. An aberrant event such as an oil tanker crash may nevertheless be material in the eyes of a reasonable investor in the unlucky oil company. Analogously, even if the unauthorized inventory of golf clubs was a one-time occurrence, it may have posed significant consequences for Adams Golf's

relationships with its authorized distributors, and signaled trouble that might be difficult to overcome.

Perhaps animated by this concern, the Company issued a press release on June 9, 1998, one month prior to going public, noting that it had filed an equitable bill of discovery to investigate the unauthorized inventory. According to the press release, "Adams Golf became concerned when it learned that Costco was selling their Tight Lies fairway woods because Costco is not an authorized distributor." While not all company press releases publicize material information, we recognize that a company often chooses to issue an extraordinary press release when it needs to disseminate important information to its investors. In light of this public acknowledgment of the unauthorized inventory and its announcement of legal action, and our obligation to draw all reasonable inferences in favor of the plaintiffs, we are hard pressed to see how the existence of 5,000 golf clubs for sale at a discounter, outside the protected distribution network, was unquestionably immaterial to a reasonable investor.[9]

---

[9]The District Court found that the "Bill of Discovery and the issuing of the press release [prior to the IPO] are consistent with the defendants [sic] contentions that it was in fact Adams Golf's policy not to authorize 'distribution of the Company's products to discount retailers.'" 176 F. Supp. 2d at 233. Yet such "consistency" is

9

On appeal, the defendants contend that the fact that the gray market was not material is reflected by the absence of any decline in share value when the market learned of it in the January 7, 1999 press release.[10] They rely on *In re Burlington*

not salient to a materiality inquiry. Adams Golf may have been working resolutely, in conformance with its stated policy, to solve its unauthorized inventory situation. But a company's effort to manage a problem does not by itself discharge its obligation to inform investors of that problem; if an event is material, the securities laws may require disclosure, notwithstanding the type of consistency identified by the District Court. If it were otherwise, companies could justify keeping quiet about significant corporate crises by simply noting that they were handling the situation in accordance with some previously stated management policy.

[10]The defendants also argue that the June 9, 1998 *pre*-IPO press release sufficed to inform the public of Costco's unauthorized inventory of Tight Lies clubs. They argue that if information regarding any gray market problem was placed in the public domain through its pre-IPO press release, the Company would have had no obligation to mention it in their offering materials. First, this contention of course contradicts the defendants' claim that the stock price did not drop after the investing public *first* learned of the gray market problem on January 7, 1999. Second, the cases relied

upon by the defendants are inapposite. *See Acme Propane, Inc. v. Tenexco, Inc.*, 844 F.2d 1317, 1323 (7th Cir. 1988) (no obligation to disclose information on relevant state laws as statutes are in the public domain); *Rodman v. Grant Found.*, 608 F.2d 64, 70 (2d Cir. 1979) (no obligation to disclose motivation of corporate officers to maintain corporate control and prevent hostile takeovers as such intentions are "universal."); *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978) (no obligation to disclose labor difficulties when those problems were "reported countrywide in the press and on radio and television, were discussed in Congress, and were analyzed in published administrative and judicial opinions."). Costco's unauthorized inventory, announced in a single press release before the Company went public, was simply unlike the publicly known or available facts in the above cases.

Further, we find that the defendants' citation to this Court's decision in *Klein v. General Nutrition Co.*, 186 F.3d 338 (3d Cir. 1999), to be even further afield. *Klein* involved securities traded on the secondary market. We held that the market "promptly digested current information regarding GNC from all publicly-available sources and reflected that information in GNC's stock price." *Id.* at 338. But there is no indication that there was any such efficient market in Adams Golf shares prior to the IPO. Accordingly, we cannot conclude that the pre-IPO press release in this case, issued a

*Coat Factory Sec. Litig., Inc.*, 114 F.3d 1410 (3d Cir. 1997), in which we observed that "to the extent that information is not important to reasonable investors, it follows that its release will have a negligible effect on the stock price." *Id.* at 1425. But *Burlington Coat Factory* was a Rule 10b-5 case brought under the 1934 Act, which requires that plaintiffs plead loss causation, i.e., allege that the material misstatement or omission caused a drop in the stock price. Actions brought under the 1933 Act are, however, critically different. Under sections 11 and 12(a)(2), plaintiffs do not bear the burden of proving causation. It is the defendants who may assert, as an affirmative defense, that a lower share value did not result from any nondisclosure or false statement. *See* 15 U.S.C. §§ 77k(e), 77*l*(b). While a defendant may be able to prove this "negative causation" theory, an affirmative defense may not be used to dismiss a plaintiff's complaint under Rule 12(b)(6).[11]

---

month before the offering materials were filed, was sufficient to inform the investing public of a gray market in Adams Golf equipment.

[11] In any event, while there was no effect to the stock in *Burlington Coat Factory*, here, after disclosure of the gray market in the January 7, 1999 press release, the number of Adams Golf shares traded jumped from 58,000 to 1.2 million, and resulted in a 17 percent decline in the stock price, though in absolute terms, this just represented a drop from $4.63 to $3.88.

*Doe v. GTE Corp.*, 347 F.3d 655, 657 (7th Cir. 2003) ("[L]itigants need not try to plead around defenses.").

Mindful of this Court's dismissal standard for immateriality, and our obligation to draw reasonable inferences in the plaintiffs' favor, we cannot agree with the District Court's conclusion that the gray market issue was obviously unimportant to a reasonable investor. Of course, ultimately, Costco's inventory of Tight Lies golf clubs may be found to be immaterial, but that is for a factfinder to determine in light of a developed record.

A determination that information missing from a registration statement and prospectus is material does not end our analysis. We must also decide whether the issuer had the duty to disclose that material fact such that its omission made the statement misleading. *See Zucker v. Quasha*, 891 F.Supp. 1010, 1014 (D.N.J. 1995) ("To avoid committing misrepresentation, a defendant is not required to disclose all known information, but only information that is 'necessary to make other statements not misleading.'" (quoting *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 640 n.16 (3d Cir. 1989))). In order to make out prima facie violations of sections 11 and 12(a)(2), plaintiffs must allege that an omitted material fact was required to be included by the securities laws or that its absence rendered statements in the prospectus misleading. *See* 15 U.S.C. § 77k(a) (referring to "an untrue statement of a material fact or omitted to state a material

fact required to be stated therein or necessary to make the statements therein not misleading"); § 77*l* (referring to "an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading"). As noted above, the plaintiffs allege that the Company's statements touting its limited distribution arrangements were false or misleading in light of the omitted gray market problem. While we agree with the District Court that none of these statements in the registration statement was technically false, we disagree with the Court's conclusion that the statements were obviously not misleading.

The relevant statements in the offering materials indicated that distribution was limited to certain retailers and that the Company "does not sell its products through price sensitive general discount warehouses." The District Court properly found that Costco's *unauthorized* possession of Adams Golf clubs could not be reasonably taken to make those statements false, for there was no allegation that Adams Golf itself sold golf clubs to unauthorized retailers. But while technically true, those statements may have nevertheless led a reasonable investor to conclude that the selective distribution model was functioning properly, i.e., that this method was exclusive, and therefore that unauthorized retailers were not selling significant quantities of its Adams Golf merchandise. Reasonable minds could disagree as to whether the omitted fact of

Costco's unauthorized possession, in addition to the alleged "sales by other unauthorized discount retailers and international gray market distributors," were necessary to make the statements regarding the Company's limited distribution not misleading. Accordingly, we will reverse the District Court's dismissal of the plaintiffs' gray market claims.

B

We next turn to the plaintiffs' claims regarding an oversupply of golf equipment among retailers. As noted above, the plaintiffs contend that the omission of this oversupply rendered two sets of statements in the offering materials materially misleading: 1) the specific representation that "[t]he Company believes its prompt delivery of products enables its retail accounts to maintain smaller quantities of inventory than may be required with other golf equipment manufacturers"; and 2) the general forward-looking statements concerning the trends "likely to increase the demand" for Adams Golf products. We agree with the District Court that neither of these statements were materially misleading by the omission of these industry conditions.

Adams Golf's specific claims to nimble delivery and relatively smaller inventory were not rendered false or misleading in light of any alleged industry-wide oversupply of golf equipment. The offering materials merely indicated that stores had fewer Adams Golf clubs in their

inventories than the equipment of other manufacturers. The statement cannot reasonably be taken to mean that "Adams Golf retailers were <u>not</u> carrying excess inventory," as plaintiffs allege. Those retailers may very well have had bloated inventories. But they may have maintained a relatively smaller inventory of Adams Golf equipment while carrying a surplus of merchandise produced by Adams Golf's competitors. We find that plaintiffs' allegations concerning retailers' excess supplies of *other companies*' equipment simply cannot render false or misleading that portion of the registration statement concerning the retailers' smaller inventory of Adams Golf products.

While the plaintiffs may be able to prove their allegations that Adams Golf's rivals were suffering from retail oversupply and were taking "corrective action to address the industry-wide oversupply" problem at the time of Adams Golf's IPO, these allegations are of no moment. Whatever financial problems other manufacturers and retailers may have struggled with, the securities laws obligated Adams Golf to disclose material information concerning its own business and not necessarily the details relating to its competitors. *See Trump Casino*, 7 F.3d at 375 (holding that "the issuer of a security [need not] compare itself in myriad ways to its competitors, whether favorably or unfavorably. . . ."); *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 517 (7th Cir. 1989) ("Issues or securities must reveal *firm-specific* information." (emphasis added)).

Further, the plaintiffs make much of the Company's April 12, 1999 press release, announcing financial results for the first quarter of 1999, in which, according to their complaint, "defendants disclosed that for at least 12 months—since well prior to the IPO—there had been an 'oversupply of inventory at the retail level' on an industry-wide basis." Initially, we observe that Adams Golf was not duty-bound to disclose general industry-wide trends easily discernable from information already available in the public domain. *See Klein*, 186 F.3d at 342 (determination of materiality takes into account "availability [of information] in the public domain"); *Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 609 (7th Cir. 1995) ("The nondisclosure of . . . industry-wide trends is not a basis for a securities fraud claim."); *Tenexco*, 844 F.2d 1317, 1323–24 ("The securities laws require the disclosure of information that is otherwise not in the public domain."). Moreover, all the April 12, 1999 press release seemed to acknowledge was that retailers of golf equipment had experienced generally sluggish sales for over a year. As discussed above, however, there is nothing contradictory or inconsistent about retailers with excess inventories in general and the Company's representation that those same retailers kept a smaller inventory of Adams Golf clubs in particular. Accordingly, we find that Adams Golf's representation of prompt delivery and relatively smaller retail inventories was not materially false or misleading. Moreover, the fact that

13

looking backward, one perceives a trend does not necessarily mean that conditions were such that one year earlier the situation was sufficiently obvious or noteworthy.

The plaintiffs also alleged that the retail oversupply affecting golf industry retailers also rendered misleading the forward-looking statements made in the registration statement. In particular, the plaintiffs argued that those forecasts were "misleading with respect to the prospects for growth in the golf industry." Those statements included sanguine prospects for the golf industry and the rising popularity of the sport more generally. But we have firmly held that "[c]laims that these kinds of vague expressions of hope by corporate managers could dupe the market have been almost uniformly rejected by the courts." *Burlington Coat Factory*, 114 F.3d at 1427.

Moreover, Adams Golf was not entirely upbeat about its future. The registration statement referred to a series of risks facing an investor, including the prospects of lagging demand for the Company's products, competitive products from rivals, unseasonable weather patterns that could diminish the amount of golf played, and an overall decline in discretionary consumer spending. Applying the "bespeaks caution" doctrine, this Court has held that meaningfully cautionary statements can render the alleged omissions or misrepresentations of forward-looking statements immaterial as a matter of law. *EP Medsystems, Inc. v.*

*EchoCath, Inc.*, 235 F.3d 865, 873–75 (3d Cir. 2000) (collecting cases). And here the cautionary statements relate directly to the claim on which plaintiffs allegedly relied; the general representations of better business ahead were mitigated by the discussion of the several factors that could have caused poor financial results. Accordingly, we agree with the District Court that plaintiffs' allegations regarding the forward-looking statements must also succumb to the motion to dismiss.

We conclude that the plaintiffs can prove no set of facts that would demonstrate that either the specific representation as to prompt delivery and retailers' inventory of Adams Golf equipment or the general forward-looking statements was materially misleading. As reasonable minds could not disagree on this issue, we affirm the District Court's dismissal of the plaintiffs' retail oversupply claims as a matter of law.

C

After the dismissal of their complaint, plaintiffs filed a motion under Fed. R. Civ. P. 59(e) to amend or alter the judgment so as to add new allegations by virtue of Fed. R. Civ. P. 15.[12] They sought

---

[12]The plaintiffs had already amended their complaint once before. After filing their original complaint on June 11, 1999, the plaintiffs amended their complaint on May 17, 2000, the "Consolidated and Amended Class Action" complaint. It was

to introduce "new" factual allegations about both the gray market and retail oversupply claims. The District Court denied the motion in a subsequent order, which ruling we review for abuse of discretion. *Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 272 (3d Cir. 2001).

But the purported new allegations consist not of new information, but, rather, information available at all times relevant to this action and facts not necessarily curative of the pleading problems at issue. With respect to the gray market claim, the plaintiffs merely furnished additional details, such as the extent of financial losses attributable to unauthorized distribution, none of which would have affected the substance of a Rule 12(b)(6) analysis. We note that insofar as these facts pertain to the claims concerning the gray market, the plaintiffs would be free to develop them on remand. With respect to the retail oversupply claim, the plaintiffs sought to add more detailed factual allegations seeking to show the existence of an industry-wide trend of excess inventory. This is also not helpful to their cause. In dismissing the oversupply claim, both our analysis and that of the District Court assumed the existence of such an oversupply. Whether or not we were to consider the new factual allegations, the plaintiffs' oversupply allegations do not state a claim upon which relief could be

_____

this amended complaint that the District Court dismissed under Rule 12(b)(6).

granted.

We have held that "[w]here a timely motion to amend judgment is filed under Rule 59(e), the Rule 15 and 59 inquiries turn on the same factors." *Id.* These considerations include undue delay, bad faith, prejudice, or futility. *Alston v. Parker*, 363 F.3d 229, 236 (3d Cir. 2004). The District Court found that the plaintiffs' motion to amend was unduly delayed and ultimately futile. The concept of "undue delay" includes consideration of whether new information came to light or was available earlier to the moving party. Here, as the District Court observed, plaintiffs could have introduced the allegations in the motion to amend long before the Court granted the motion to dismiss, and indeed could have included them in their original complaint filed in 1999. Plaintiffs relied at their peril on the possibility of adding to their complaint, but in doing so they clearly risked the prospect of the entry of a final dismissal order. Plaintiffs argue that they withheld the allegations so as to comply with the "short and plain statement" requirement of Fed. R. Civ. P. 8, citing to cases involving complaints in excess of 100 pages. *See, e.g., In re Westinghouse Sec. Litig.*, 90 F.3d 696, 703 (3d Cir. 1996). Considering that the amendment would have added a mere five pages of allegations to the plaintiffs' twenty-two page complaint, we do not credit this argument and conclude that the District Court did not err in refusing to open the judgment of dismissal when plaintiffs clearly relied on "misplaced confidence" in their original

pleading. *Cureton*, 252 F.3d at 274. Moreover, as the District Court reasoned, the proposed amendments would not have remedied the pleading deficiencies and would thus have been futile.

Accordingly, we find that the District Court did not abuse its discretion in dismissing the plaintiffs' motion under Rules 59(e) and 15. *Cf. Lorenz v. CSX Corp.*, 1 F.3d 1406, 1414 (3d Cir. 1993) (finding that district court did not abuse its discretion in light of plaintiff's "unreasonable delay" and futility of proposed amendments).[13]

---

[13]Plaintiffs contend that the applicable standard of review of futility determinations is *de novo*, relying upon our decision in *Burlington Coat Factory*, 114 F.3d at 1410, as adopting the standard employed by several of our sister courts of appeals, but we do need read *Burlington* as having done so. *See Freeman v. First Union Nat'l,* 329 F.3d 1231, 1234 (11th Cir. 2003) ("[W]hen the district court denies the plaintiff leave to amend due to futility, we review the denial de novo because it is concluding that as a matter of law an amended complaint 'would necessarily fail.' (quoting *St. Charles Foods, Inc. v. America's Favorite Chicken Co.*, 198 F.3d 815, 822 (11th Cir.1999))); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir.2002) ("When . . . the district court denies the motion to amend on grounds that the amendment would be futile, we review denial of the motion de novo."); *United States ex rel. Gaudineer &*

## III

For the foregoing reasons, we will affirm the District Court's dismissal of the plaintiffs' claims relating to retail oversupply and we will reverse the dismissal of those claims relating to the gray market and remand for further proceedings consistent with this opinion.

---

*Comito, L.L.P. v. Iowa*, 269 F.3d 932, 936 (8th Cir. 2001); *Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir. 1996). Accordingly, we decline the plaintiffs' invitation to chart a new course and consider the District Court's finding of futility for abuse of discretion.

16