OPINION
ROTH, Circuit Judge:
Customs Fraud Investigations, LLC (CFI), the relator in this qui tarn action, appeals the District Court’s dismissal of its complaint with prejudice and the court’s denial of CFI’s subsequent motion' for leave to amend its complaint. We hold that the District Court erred in denying CFI’s motion to amend its complaint on futility grounds. Consequently, we will vacate that order and remand this case for further proceedings.
L
Victaulic Co., the defendant ip the District Court and the appellee in this matter, is a Delaware corporation with its headquarters in Easton,- Pennsylvania. It is a global manufacturer and distributor of pipe fittings. CFI, a limited liability company based in Maryland, is made up of former insiders from the pipe fitting industry. According to CFI, although none'of its employees worked for Victaulic, CFI’s principals have worked on numerous trade investigations involving pipe and tube products and have provided direct support to senior officials at the U.S. International Trade Commission and the U.S. Department of Commerce on issues in the- industry.
To better understand CFI’s allegations, it is helpful to explain the regulatory environment in which Victaulic operates. Pipe fittings, such as those Victaulic manufactures, are the subject of specific, non-discretionary import regulations set forth in the Tariff Act of 1930.[1] Pipe fittings must, with limited exceptions, be marked with the English name of the country of origin *246 by means of one of five methods.[2] Only if it is technically or commercially infeasible to mark an article by one of the five enumerated methods may a pipe fitting be marked in another manner. Under no circumstances may an article of foreign origin be completely unmarked.[3] If an importer releases unmarked or improperly marked goods into the stream of commerce in the United States, the importer owes a duty of 10 per centum ad valorem on the improperly marked goods.[4] This duty, known as a “marking duty,” is deemed to have accrued at the time of importation and must be paid in addition to any other duty imposed by law.[5]
This is not to say, however, that an importer may bring improperly marked goods into the United States merely by paying a marking duty. Instead, if improperly marked goods are imported and discovered by customs officials, an importer has three options: (1) re-export the goods, (2) destroy them, or (8) mark them appropriately so that they may be released from the custody of the United States for sale in the domestic market.[6] Customs officials at United States ports of entry are unable to inspect every import; they rely primarily on the importers themselves to self-report any duties owed and any goods that are unmarked or improperly marked. In those instances where improperly marked goods enter the stream of commerce in the United States, the marking duty is due, retroactive to the time of importation.[7] Imposition of the duty is non-discretionary since, by statute, such duties “shall not be remitted wholly or in part nor shall payment thereof be avoidable for any cause.”[8] In setting forth this regulatory scheme, Congress specifically noted that marking duties “shall not be construed to be penal” and are to be considered similar to any other customs duty owed.[9]
The gravamen of CFTs allegations is that Victaulic has, over the past decade, imported millions of pounds of improperly marked pipe fittings without disclosing that the fittings are improperly marked. Since this improper marking was not discovered by customs officials, Victaulic avoided paying marking duties on these fittings. As support for its claims, CFI’s complaint alleged that Victaulic imported approximately 83 million pounds of fittings from overseas between 2008 and 2013 and a miniscule fraction of Victaulic’s pipe fittings for sale in the U.S. bear any indication of their foreign origin, with an even smaller percentage bearing country of origin markings compliant with the applicable statute. According to the complaint, “Vic-taulic is able to successfully (albeit unlawfully) import its unmarked pipe fittings into the United States by knowingly failing to pay or disclose to the CBP [Bureau of Customs and Border Protection] the marking duties the company owes ... by, among other things, falsifying its entry documents and otherwise concealing the foreign source of its pipe fittings such that CBP will not detect the company’s fraud.”
These actions, according to CFI, give rise to the present qui tam action under the so-called “reverse false claims” *247 provision in the False Claims Act (FCA).[10] Typically, a claim under the FCA alleges that a person or company submitted a bill to the government for work that was not performed or was performed improperly, resulting in an undeserved payment flowing to that person or company. The FCA was enacted as a reaction to rampant fraud and price gouging by merchants supplying the Union army during the Civil War.[11] In this case, by contrast, the allegation is not that Victaulic is obtaining monies from the government to which it is not entitled, but rather that it is retaining money it should have paid the government in the form of marking duties. Wrongful retention cases such as these are known as “reverse false claims” actions.
CFI filed its initial complaint, under seal, on May 30, 2013, in the United States District Court for the Eastern . District of Pennsylvania. On August 7, the United States declined to intervene in the matter. After being served, Victaulic filed a motion to dismiss pursuant to Federal Rule of Civil Procedure -12(b)(1) and 12(b)(6). Vic-taulic contested the District Court’s jurisdiction by contending that CFI’s complaint violated the FCA’s ban on suits based primarily on publicly available information.[12] Victaulic alleged, in the alternative, that the complaint failed to present a plausible claim because it was too conclusory. Discovery was stayed pending the District Court’s decision on the motion to dismiss.
When the District Court held a hearing on Victaulic’s motion, argument focused on Victaulic’s contentions that the FCA’s public disclosure bar was jurisdictional and that all of the information in CFI’s complaint was publicly available. In its subsequent opinion, the District Court rejected these arguments, holding that the FCA’s public disclosure bar was not jurisdictional and, in any event, CFI’s complaint was not based on publicly available information within the meaning of the FCA.
Then, turning to Victaulic’s alternative argument that the claim was conclusory, the District Court held that CFI’s complaint did not state a claim on which relief could be granted because it failed to cross the Twombly/Iqbal threshold from possible to plausible. In doing so, the District Court mentioned that it believed the FCA’s reverse false claims provision did not cover failure to pay marking duties, but declined to rule on those grounds because the complaint was based on legal conclusions unsupportable by the facts alleged. The District Court dismissed the complaint with prejudice, without any discussion of why CFI should not be afforded the opportunity to amend its complaint to solve any perceived deficiencies.
CFI promptly moved for relief from judgment and for leave to amend its complaint, including a proposed First Amended Complaint (FAC) that contained substantially more detailed factual allegations. While the contours of the claim remains the same in both complaints, the FAC includes details that address at least some of the concerns that the District Court had expressed in its opinion. Of particular import, the FAC details the rationale behind CFI’s investigation of Victaulic and discusses the methodology CFI used to develop its claims.
This investigation involved a multifaceted analysis before filing suit, consisting of two parts: (1) an analysis of shipping mani *248 fest data purporting to show that Victaulic imports the majority of its pipe fittings from overseas and (2) a study of listings from the online auction site eBay for Vic-taulie products that CFI used as a proxy for the Victaulic product market. Out of the more than 200 listings for Victaulic pipe fittings CFI reviewed, there were virtually no products for sale that CFI considers properly marked. Based on its analysis, CFI concluded that systematic fraud must be occurring, since the majority of Victaulic’s products are imported but virtually no products for sale on the secondary market are properly marked with the foreign country of origin markings required by law.
CFI bolstered the FAC by attaching, an expert declaration stating that CFI’s analysis “provides ‘overwhelming evidence’ that Victaulic is not properly marking its pipe fittings,” and attached actual examples of the data on which CFI and its expert based their analyses. Moreover, the FAC included two allegations that did not appear in the original complaint: a statement from an unnamed witness who recalled a specific instance of obtaining improperly labeled Victaulic products, and a reference to a District Court hearing where, according to CFI, Victaulic showed a photograph of a pipe fitting to the court that CFI contends was a prime example of improper marking.
The District Court denied CFI’s motions on two grounds. First, it held that CFI unduly delayed its motion for leave to amend because it should have been on notice that the District Court was considering dismissing the complaint based on comments the court made at the motions hearing. Second, the District Court held that the FAC was futile, stating explicitly that failure to pay marking duties could not, as a matter of law, give rise to a reverse false claims action because the duties were too attenuated and contingent to qualify as the types of obligations to pay money to the government covered by the FCA. This appeal followed, in which the United States appears as amicus curiae, arguing that the District Court’s interpretation of the FCA’s reverse false claims provision is incorrect and that marking duty obligations are covered by the FCA.[13]
II.
The District Court had jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, We have jurisdiction over the District Court’s orders dismissing the complaint, denying relief from judgment, and denying CFI’s motion for leave to amend pursuant to 28 U.S.C, § 1291. We review a District Court’s judgment of dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) de novo,[14] We accept all factual allegations in the complaint as true and' “determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.”[15]
We review a District Court’s denial of a Rule 59(e) motion for relief from judgment for abuse of discretion (except for questions of law, which are subject to plenary review).[16] Similarly, we review a Rule 15 motion for leave to amend a complaint for abuse of discretion, and if “a *249 timely motion to amend judgment is filed under Rule 59(e), the Rule 15 and 59 inquiries turn on the same factors.”[17] Under such a review, we are cognizant of Rule 15’s admonition that leave to amend should be freely given “when justice so requires.”[18] “A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law....”[19]
III.
There are three instances when a court typically may exercise its discretion to deny a Rule 15(a) motion for leave to amend: when “(1)’ the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other party.”[20] The District Court relied on two of those grounds in denying CFI’s motion for leave to amend: undue delay and futility. We will explain why CFI’s delay was not undue before turning to the merits of the FAC.
A;
Generally, Rule 15 motions should be granted. In Foman v. Davis, the Supreme Court held that the fundamental purpose of Rule 15 is to allow a plaintiff “an opportunity to test his claim on the merits,” and although “the grant or denial of an opportunity to amend is within the discretion of the District Court,” that discretion is abused if it is exercised without giving the plaintiff sufficient opportunity to make her case.[21]
At oral argument before us, counsel for CFI admitted that CFI was “waiting to see what the court said” before filing its motion to amend its complaint because CFI had “thought the court was going to deny the motion to dismiss.” The District Court held that this tactic made CFI’s delay undue because CFI was “on notice of the defects in its complaint once Victaulic moved for dismissal,” and CFI was notified “that the Court was considering a dismissal with prejudice,” based on comments made from the bench during a hearing on Victaülic’s motion. The record, however, is not so clear.
First, the mere fact that a defendant -files a motion to dismiss is not necessarily sufficient to put a plaintiff on notice that the court will find his complaint to be deficient. One of the consequences of the Supreme Court’s decisions in Twombly and Iqbal[22] is a general increase in the number of motions to dismiss filed against plaintiffs. As a result, plaintiffs are now twice as likely to face a motion to dismiss.[23] It is highly unlikely that in the years since Twombly was decided, plaintiffs’ complaints are dramatically worse or *250 less meritorious. Rather, defendants now have incentive “to challenge the sufficiency of the plaintiffs complaint more frequently.”[24] More frequent motions to dismiss are not necessarily more meritorious motions to dismiss.
Second, in addition to arguing that CFI’s complaint did not pass muster under the applicable pleading standards, Victaulic argued that the public disclosure bar in the FCA deprived the District Court of jurisdiction over the case. Much of the hearing on Victaulic’s motion to dismiss dealt with the two relevant parts of that issue: whether the public disclosure bar was jurisdictional and whether the information on which CFI’s complaint is based was in the public domain within the meaning of the FCA. The District Court rejected Victaulic’s arguments, finding that the information on which CFI based its complaint was not in the public domain and holding that the public disclosure bar is not jurisdictional. Having disposed of these two substantial issues, the District Court then granted the motion to dismiss on the other ground raised by Victaulic: that the complaint was based on legal conclusions, not supported by fact.
CFI then moved to amend its complaint. In denying the motion, the District Court opined that, based on comments from the bench, the court itself had put CFI on notice that its complaint would be dismissed with prejudice. We disagree. As was pointed out at oral argument before us, judges at all levels make statements and ask questions during hearings that may not be a clear indication of the court’s views or how a case will eventually be decided. To expect the plaintiff to pick, from dozens of questions and statements over the course of a hearing, those questions that signal what the court will ultimately decide is to expect too much.
Moreover, even though at the hearing the District Court called the plaintiffs complaint “bare bones” and implied that the plaintiff might need to plead more facts, those statements were not a ruling, a holding, or an explanation of how the court intended to rule. We cannot see how, on this record, CFI could have reasonably been expected to understand from the District Court’s comments that CFI was in danger of having its entire suit dismissed with prejudice were it not to move to amend its complaint immediately after argument, instead of immediately after the decision came down.
This is not to say that a plaintiff will never be on notice of potential deficiencies based on a motion to dismiss or comments from the bench. Nevertheless, in the context of a typical Rule 12(b)(6) motion, a plaintiff is unlikely to know whether his complaint is actually deficient—and in need of revision—until after the District Court has ruled. Once CFI had actual notice of the perceived deficiencies in its complaint, it promptly moved to file its first amended complaint.
Third, we have rarely upheld a dismissal with prejudice of a complaint when the plaintiff has been given no opportunity to amend. Victaulic attempts to sidestep this fact by arguing that the FAC is a de facto second amended complaint because the District Court considered additional evidence outside the original complaint at the hearing on Victaulic’s motion. As a procedural matter, there is no basis for this contention. The record is clear that CFI’s motion for leave to amend was CFI’s first attempt to file an amended complaint.
Moreover, at the outset of the hearing on Victaulic’s motion to dismiss, *251 the District Court noted that it had received “a lot of factual material from the plaintiff that goes beyond the allegations of the complaint.” Since Victaulic’s motion was filed pursuant to Rule 12(b)(1) as well as Rule 12(b)(6), consideration of this information was proper, to a point. When a Rule 12(b)(1) motion is evaluated as a “factual attack” on the Court’s subject matter jurisdiction, “the court may consider evidence outside the pleadings” in evaluating that attack.[25] When a motion to dismiss implicates both Rule 12(b)(6) and Rule 12(b)(1), outside evidence may be considered for Rule 12(b)(1) purposes but not for Rule 12(b)(6) purposes.[26]
CFI’s counsel made this point at the hearing before the District Court, stating that CFI had submitted additional information only for purposes of the Rule 12(b)(1) motion and that that evidence should not be considered for the Rule 12(b)(6) motion. The District Court seems to have accepted the point, noting that it believed the additional evidence would help the court evaluate both parts of the motion, but acknowledging that the additional evidence was only submitted for the Rule 12(b)(1) motion. In its opinion, however, the District Court noted that it was not considering “these additional facts in assessing the sufficiency of the complaint itself,” but that it would consider the facts “in determining ... whether, having dismissed the original complaint, the Court should grant CFI leave to file an amended complaint containing these additional factual allegations.” The District Court did not refer to any legal basis for considering evidence outside the complaint in determining whether to dismiss a complaint with prejudice on a 12(b)(6) motion. Moreover, the District Court did not have a motion to amend pending before it when it issued its opinion, making any consideration of whether to grant such a motion hypothetical at best.
In essence, by considering the evidence submitted on the Rule 12(b)(1) motion when deciding a Rule 12(b)(6) motion, the District Court converted Victaulie’s Rule 12(b)(6) motion into a motion for summary judgment. The court could have done so pursuant to Rule 12(d), under which consideration of evidence submitted outside the complaint would be proper. Rule 12(d) requires, however, that the parties “be given a reasonable opportunity to present all the material that is pertinent to the motion.” [27] The District Court did not notify the parties that it was converting Victaulic’s Rule 12(b)(6) motion to one for summary judgment under Rule 12(d), and CFI was not given a reasonable opportunity to present more information.
In addition to these procedural irregularities, the District Court abused its discretion in finding that CFI’s attempt to amend its complaint constituted undue delay. The District Court held that “CFI is imposing an unwarranted burden on the Court by requiring the Court to waste judicial resources revisiting issues that could have been addressed earlier,” and that “the FAC rests almost entirely on information that was already before the Court or that CFI could have presented to the Court prior to dismissal.”
The District Court relied on several cases[28] to reach its conclusion. That reli- *252 anee is, however, misplaced. It is true that in Jang v. Boston Scientific Scimed, Inc., we noted that we have “declined to reward a wait-and-see approach to pleading.”[29] In context, however, that statement was of no practical import, since in Jang we reversed the District Court’s entry of judgment on the pleadings and remanded for further proceedings, explicitly noting that the plaintiff remained “free to file a new motion for leave to amend.”[30]
Similarly, in In re: Adams Golf, Inc. Securities Litigation, we reversed a District Court’s decision granting a Rule 12(b)(6) motion in part, but affirmed the denial of a motion for leave to amend based on futility and “undue delay.”[31] In that case, the District Court had already allowed one Amended Complaint and found that the proposed Second Amended Complaint was futile since it did not contain new material allegations.[32] Also, in California Public Employees’ Retirement System v. Chubb Corp. (CPERS), the case involved allegations of securities fraud subject to the Public Securities Litigation Reform Act. The court affirmed the denial of a motion for leave to amend after the district court had previously allowed two amended complaints, denied both and given extensive guidance to the plaintiff as to the deficiencies the district court saw with the amended complaints.[33]
Finally, the District Court relied upon Arthur v. Maersk, Inc.,[34] as an example of our rejection of the “wait-and-see approach to pleading.” In Arthur, we held that a delay of less than a year from the filing of an initial complaint to the filing of an amended complaint is rarely, if ever, sufficient to become undue,[35] Here, the elapsed time from filing of the initial complaint— which had to be filed under seal pursuant to the FCA and could not be served on the defendant—to the amended complaint was approximately sixteen months. Under the circumstances, the lapse of time is not “so excessive as to be presumptively unreasonable.” [36]
In none of the cases the District Court relied upon did we uphold a dismissal with prejudice where the plaintiff had been given no opportunity to amend its complaint and would not be given an opportunity to amend in the future.
For the reasons stated above, we hold that the District Court’s denial of the CFI’s motion for leave to amend was error. Nevertheless, the District Court would have been justified in denying CFI’s motion if the FAC was itself futile, which was the alternative ground on which the District Court based its opinion. We turn to that rationale next.
B.
In rejecting CFI’s FAC as futile, the District Court held that, as a matter of law, failure to pay marking duties could not give rise to a reverse FCA claim and that CFI failed to meet the pleading requirements of Federal Rule of Civil Procedure 9(b). Both holdings were error. We *253 will first .address why marking duties fall within the FCA’s reverse false claims provision before addressing the alleged deficiencies in CFI’s FAC.
1.
The reverse false claims provision oj: the FCA[37] was revised as part of the Fraud Enforcement and Recovery Act of 2009 (FERA).[38] Although many reforms were enacted as part of the FERA, Congress specifically enacted one portion in response to a perceived narrowing of the scope of the reverse false claims provision.
Prior to 2009, the reverse false claims provision provided for a civil penalty for one who “knowingly makes, uses, or causes to be" made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.”[39] The word “obligation” was not defined in the statute.[40] The FERA made two substantial changes. First, it added to the reverse false claims provision the phrase “or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government”.[41] Second, it defined an ^obligation” as “an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or li-censor-licensee ■ relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment.”[42] These two sections broadened the scope to which reverse false claims liability would attach.
The new definition was, in part, a reaction to the decision in American Textile Manufacturers Institute, Inc. v. The Limited, Inc. (ATMI), which held that the term “obligation” should be afforded “a different,, and more limited, meaning” than the meaning afforded the word “claim” in the FCA, and that reverse false claims liability should be viewed more narrowly than general false claims liability.[43] Specifically, the ATMI court limited reverse false claims liability to those circumstances where “an obligation in the.nature of those that gave rise to actions of debt at common law for money or things owed” would have arisen.[44] •
The Senate Report on the FERA states that the new definition of “obligation” was intended to address “confusion among courts that have developed conflicting definitions.” [45] The FERA rejected the reasoning in ATMI, with the Senate Report highlighting the definition’s express inclusion of “contingent, non-fixed obligations” that encompasses “the spectrum of possibilities from the fixed amount debt obligation,” typically at issue at. common law, “to the instance where there - is a relationship between the Government and a person that results in the duty to pay the Government money, whether or not the amount owed is yet fixed.”[46] In effect, the FERA expressly rejected ATMI’s narrow interpretation of the FCA’s reverse false claims provision *254 in favor of a more broadly inclusive definition.
Of particular importance here, the Senate Report discussed “customs duties for mismarking country of origin,” and how such duties would- be covered by the amended reverse false claims provision.[47] The Report notes that an early version of the FERA named marking duties explicitly in the definition of “obligation” so as to leave no doubt about the abrogation of ATMI, but the Senate considered the language in the new definition so clear that “any such specific language would be unnecessary,” since “customs duties clearly fall within the new definition of the term ‘obligation.’”[48] With this background in mind, we turn to the conduct at issue here.
At the outset, in reviewing the marking duty provision of the Tariff Act, the District Court held that “an importer does not owe marking duties upon importation of unmarked or mismarked merchandise.” While technically correct, this makes too fine a distinction between the time at which an importer must pay marking duties and the time at which such duties accrue. It is true, as Victaulic argues, that when mismarked or unmarked goods are in government custody the importer may not simply pay marking duties to obtain the release of such goods.[49] By statute, such goods must be properly marked, reexported, or destroyed under government supervision.[50] Yet, if such goods nevertheless escape detection and are released into the United States, the ten percent ad valo-rem duty is deemed to “have accrued at the time of importation” and is due and owing, without exception.[51]
This is precisely what CFI alleges Vic-taulic did in a systematic way for years. Victaulic, according to CFI, knew its goods were not marked properly and, therefore, knew that the imported pipe fittings should not have been released from government custody. Had Victaulic informed the government of this state of affairs, the goods would not have been allowed into the country. By staying silent, CFI alleges that Victaulic made a choice—to pay the ten percent marking duty owed on its goods, if its scheme was discovered, instead of paying to have the goods marked properly, re-exported, or destroyed. Hence, in CFI’s view, Victaulic knowingly concealed information from the government by not informing customs officials that the imported pipe fittings were not marked properly. According to CFI, once the pipe fittings cleared customs, Victaulic knew it owed marking duties that accrued on importation but did not pay them. This, in CFI’s view, gives rise to reverse false claims liability for the unpaid marking duties.
The plain text of the FCA’s reverse claims provision is clear: any individual who “knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government” may be subject to liability.[52] As alleged by CFI in the amended complaint, Victaulic declined to notify the Bureau of Customs and Border Protection of its pipe fittings’ non-conforming status. This failure to notify resulted in the pipe fittings being released into the stream of commerce in the United States *255 and, consequently, marking duties being owed and not paid.
The District Court held that this conduct is immaterial and cannot give rise to a reverse false claims liability. To reach this conclusion, the court followed the reasoning in ATMI, but, as previously discussed, that reasoning has been called -into doubt, if not entirely abrogated, by the FERA. Prior to the FERA, the “knowingly and improperly avoids or decreases an obligation” language was absent from the FCA.[53] In the pre-FERA FCA, a false statement or record was a necessary element for reverse FCA liability to attach-.[54] A false statement is no longer a required element, since the post-FERA FCA specifies that mere knowledge and avoidance of an obligation is sufficient, without the submission of a false record, to give rise to liability.[55] Consequently, the District Court’s reliance on ATMI and ATMI’s focus on the submission of a false record is misplaced.
Indeed, the District Court’s lengthy discussion of whether Victaulie filled out its customs forms in a proper manner is ultimately of no import since, under the post-FERA FCA, Victaulie need not have made any express statement to the government to give rise to reverse false claims liability. The statute, 19 U.S.C. § 1484(a)(1), requires an importer to provide “such information as is necessary to enable [CBP] to determine whether [its] merchandise -may be released from the custody of [CBP]” and to “enable [CBP] to properly assess duties on [imported] merchandise.” If Vic-taulic knowingly failed to disclose to CBP the fact that its goods were unmarked or improperly marked despite its affirmative obligation to do so under § 1484(a)(1) and if such goods nevertheless escaped detection and were released into the United States, Victaulie would be liable under the FCA. Thus, CFI need only prove that Victaulie • knew its pipe fittings were improperly marked and did not notify the Bureau of Customs and Border Protection, since to do so is to conceal information customs officials needed to know in order to determine whether to release Victaulic’s goods from its custody.[56]
From a policy perspective, the possibility of reverse false claims liability in such circumstances makes sense in the context of the larger import/export regulatory scheme created by Congress. Because of the government’s inability to inspect every shipment entering the United States, an importer may have an incentive to decline to mention that its goods are mismarked on the assumption that the mismarMng will not be discovered. In doing so, an importer avoids its obligation under 19 U.S.C. § 1484 to provide the government with such information as is necessary to enable the Bureau of Customs and Border Protection to determine whether the merchandise may be released, from government custody or whether it must be properly marked, re-exported or destroyed pursuant to 19 U.S.C. § 1304(i). Moreover, if the importer believes the value of bringing unmarked or improperly marked goods into the country exceeds the risk that the deception will be discovered and the ten percent ad valorem duty will be owed, an *256 importer may decline to mention that its goods are mismarked, since the chance that some goods will be discovered as mis-marked and that marking duties will be owed would still result in a net gain to the company. Reverse false claims liability changes that value proposition because a finding of deception carries the possibility of treble damages.
The statutory text, legislative history, and policy rationale underlying the regulatory scheme all lead to one conclusion: reverse false claims liability may attach as a result of avoiding marking duties. Consequently, the District Court erred in holding otherwise.
2.
The District Court’s determination that CFI’s FAC failed to meet the pleading requirements of Federal Rules of Civil Procedure 8(a)[57] and 9(b)[58] is also in error. At the motion to dismiss stage, a court must “accept as true all of the allegations contained in a complaint,” make all reasonable inferences in favor of the plaintiff, and refrain from engaging in any credibility determinations.[59] In the FAC, CFI lays out in great detail each shipment of pipe-fittings Victaulic imported during the requisite time period, as well as the methodology pursuant to which CFI concluded that these shipments consisted of improperly marked or unmarked goods for which the marking duties were not paid. Given the operation of customs marking duties, CFI’s discovery of what it believes to be unmarked or improperly marked goods in the stream of commerce in the United States plausibly shows liability under the FCA.
This “discovery” by CFI must of course be based on a reliable methodology. The FAC details the process by which CFI came to its conclusions. After determining that a “significant majority”[60] of Victaulic’s pipe fittings were imported from China and Poland, CFI reasoned that “one would expect to see Victaulic pipe fittings sold in the United States and manufactured in recent years bearing ‘Made in China’ or ‘Made in Poland’ country-of-origin markings.”[61] In the FAC, CFI then describes how it “executed a unique study of the secondary market for Victaulic pipe fittings (CFI’s ‘product study*), with the goal of objectively determining what percentage of Victaulic pipe fittings for sale in the United States have foreign country-of-origin markings.”[62]
CFI attached to the FAC a report by its expert, Abraham J. Wyner, Ph.D,, a professor of Statistics at the University of Pennsylvania’s Wharton School of Business. Professor Wyner explained that because CFI did not “have access to direct evidence that traces and tracks imported Victaulic pipe fittings in the U.S, supply chain,” “statistical methods can be used to establish indirect evidence.” Professor Wyner then “opines that the process chosen by CFI to survey the secondary market for Victaulic products ‘is standard practice’ in this regard.”[63]
*257 As set forth in the FAC, in setting up its survey, CFI determined that Victaulic sold pipe fittings through distributors and directly to end-users[64] and that a review of such sales is only possible through a review of after-market sales.[65] Victaulic products are sold on secondary markets in the United States, including on eBay which CFI determined “is an active' and diverse secondary sales outlet for Victaulic products.” [66] CFI then noted that a review of secondary sales outlets provided a much wider spectrum of total Victaulic sales in the country than a review of the sales of a particular distributor. A secondary market sales review included “different channels of distribution, as well as a wider range of dates in which sales might have been made.”[67]
Professor Wyner concluded that “CFI’s findings are so stark that the only conclusion one can possibly reach is that Victaulic is not properly marking its imports,”[68] At the motion to dismiss stage, without the benefit of any discovery, taking all facts as true, and making all reasonable inferences in favor of the plaintiff, we conclude that that showing is enough to allow this matter to proceed.
It is this study, however, that the dissent describes as “unsupported assumptions” and “numerical guesswork.” The dissent criticizes the numbers arrived at by CFI, for instance that statistically less than 2% of the Victaulic pipe fittings in the secondary market bore foreign country of origin markings.[69] That finding of less than 2% is not, however, necessary to demonstrate the plausibility that, since Victaulic is importing a “significant majority” of its pipefittings, some approximation of that number of Victaulic pipefittings with foreign country-of-origin markings would show up in the secondary market.[70]
[71]
The District Court was skeptical of the validity of CFI’s methods of determining whether Victaulic had imported unmarked goods. We, too, are skeptical. There is little evidence to show that CFI’s unusual procedure of reviewing eBay listings is an accurate proxy for the universe of Victaulic’s products available for sale in the United States. Yet, such skepticism is misplaced at the Rule 12(b)(6) stage. For the reasons stated above, we conclude that the variable being measured here, the existence of country of origin markings on Victaulic pipefittings, could support the results of CFI’s product study only if Vic-taulic was not properly marking its imported pipefittings.
*258 Turning then to Rule 9(b), we conclude that the FAC adequately meets the particularity requirements for alleging fraud. In the FCA context, a plaintiff “must provide ‘particular details of a scheme to submit false claims [or avoid obligations] paired with reliable indicia that lead to a strong inference that claims were actually submitted [or obligations avoided].’ ”[72] The FAC refers to voluminous records detailing the shipments at issue, when they entered the country, the alleged problems with those shipments, and, by operation of law, when liability would have attached.
Although CFI has not, as the dissent points out, alleged “which shipments, during which time periods, at which ports, were supposedly unlawful,” in Foglia, we held that the facts were sufficient to meet Rule 9(b)’s heightened pleading standard where the plaintiff alleged that a dialysis center was not actually using all of the medicine for which it was getting reimbursed by Medicare. “Accepting the factual assertions made by Foglia as time,” we reasoned, we had “patient logs that show that less [medicine] was used than would be required if it were used in the single use fashion”; Medicare’s reimbursement scheme presented “an opportunity for the sort of fraud alleged”; and only the defendant “ha[d] access to the documents that could easily prove the claim one way or another.”[73] Likewise, here, we accept CFI’s allegations, as we must at this stage, that far. more Victaulic pipe fittings on the secondary market should have country-of-origin markings, that the way marking duties are assessed provides an opportunity for fraud, and that only Victaulic has access to the documents that could prove or disprove CFI’s well-pled allegations.
We conclude that, at this pleading stage, nothing more is required to give Victaulic adequate notice of the claims raised against it.
In sum, failure to pay marking duties may give rise to reverse false claims liability. CFI’s FAC contains just enough reference to hard facts, combined with other allegations and an expert’s declaration, to allege a plausible course of conduct by Victaulic to which liability would attach. Thus, since CFI did not unduly delay its motion for leave to amend and the proposed amended pleading is not futile, the District Court abused its discretion in denying CFI’s motion. We will therefore reverse and remand for further proceedings.
C.
Although we hold that CFI has done just enough to allow this matter to proceed, we are aware of the great expense and difficulty that may accompany False Claims Act discovery and the burden on defendants and their shareholders and investors of having unresolved allegations of fraudulent conduct in pending proceedings. Because of our awareness, we have looked to the recent amendments to the Federal Rules of Civil Procedure; those rules provide some guidance as to how excessive expense and difficulty may be avoided and how discovery should proceed.
In December 2015, a series of amendments to the Federal Rules were enacted to improve a system of civil litigation that “in many cases ... has become too expensive, time-consuming, and contentious, inhibiting effective access to the courts.”[74] *259 To counter these problems, the 2015 amendments placed a greater emphasis on judicial involvement in discovery and case management and cooperation among litigants’ counsel.[75]
Rule 26, which governs discovery, was among the rules amended. Rule 26(b)(1) now includes a discussion of proportionality, stating
Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party’s claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties’ relative access to relevant information, the parties’ resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.
As Chief Justice Roberts wrote of these amendments, “[t]he key here is careful and realistic assessment of actual need” that may “require the active involvement of a neutral arbiter—the federal judge—to guide decisions respecting the scope of discovery.”[76] The instant matter is a prime example of the need for such controlled discovery.
CFI alleges a massive, systematic effort by Victaulic to avoid paying marking duties on any of its imports. Since Victaulic’s motion to dismiss was granted, there has been no answer from the defendant as to whether any of CFI’s allegations are true. An answer could shed some light on these allegations. Similarly, while CFI has identified millions of pounds of imported pipe fittings that it alleges were mis-marked, proportional discovery would counsel in favor of limiting the scope of early discovery. It will be up to the District Court and counsel to determine an appropriately limited discovery plan, perhaps reviewing the documents and duties paid on a representative sample of the shipments identified by CFI.
In any event, Chief Justice Roberts noted that “[jjudges must be willing to take on a stewardship role, managing their cases from the outset rather than allowing parties alone to dictate the scope of discovery and the pace of litigation.”[77] The instant matter will require the active involvement of the District Court, in conjunction with counsel and their clients, to limit the expense and burden of discovery while still providing enough information to allow CFI to test its claims on the merits.
IV.
For the foregoing reasons, we will vacate the order of the District Court denying CFI’s motions for relief from judgment and for leave to amend its complaint. We will remand this matter for further proceedings consistent with this opinion.

. 19 U.S.C. § 1304(c).

. Id. § 1304(c)(1).

. Id. § 1304(c)(2).

. 19 Ü.S.C. § 1304(1).

. Id.

.Id.

. Id.

. Id.

.Id.

.31 U.S.C. § 3729(a)(1)(G). This section was formerly codified at 31 U.S.C. § 3729(a)(7).

.See United States ex rel. Springfield Terminal Ry. Co. v. Quinn, 14 F.3d 645, 649 (D.C. Cir. 1994).

. 31 U.S.C. § 3730(e)(4)(A).

. The United States expresses no opinion on whether CFI should have been granted leave to amend its complaint or whether the complaint states a claim.

. Bronowicz v. Allegheny Cnty., 804 F.3d 338, 344 (3d Cir. 2015).

. Id. (quoting Powell v. Weiss, 757 F.3d 338, 341 (3d Cir. 2014)).

. Cureton v. Nat’l Collegiate Ath. Ass'n, 252 F.3d 267, 272 (3d Cir. 2001).

. id.

. Fed. R. Civ. P. 15(a)(2).

. Highmark Inc. v. Allcare Health Mgmt. Sys., Inc., — U.S. -, 134 S.Ct. 1744, 1748 n.2, 188 L.Ed.2d 829 (2014) (quoting Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990)).

. U.S. ex rel. Schumann v. Astrazeneca Pharm. L.P., 769 F.3d 837, 849 (3d Cir. 2014) (quoting Lake v. Arnold, 232 F.3d 360, 373 (3d Cir. 2000)).

. 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

. Twombly and Iqbal require a complaint to "state a claim to relief that is plausible on its face,” Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

. Lonny Hoffman, Twombly and Iqbal’s Measure: An Assessment of the Federal Judicial Center’s Study of Motions to Dismiss, 6 F. Courts L. Rev. 1, 15 (2011).

. Id.

. Gould Elecs. Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000).

. Id. at 178.

. Fed. R. Civ. P. 12(d).

. See Jang v. Boston Scientific Scimed, Inc., 729 F.3d 357, 368 (3d Cir. 2013); In re: Adams Golf, Inc. Securities Litigation, 381 F.3d 267, 280-81 (3d Cir. 2004); California Public Employees' Retirement System v. Chubb *252 Corp. (CPERS), 394 F.3d 126, 163 (3d Cir. 2004).

. 729 F.3d at 368.

. Id.

. 381 F.3d at 280-81.

. Id. at 280; 280 n. 12.

. 394 F.3dat 163.

. 434 F.3d at 204.

. Id. at 205 (citing Tefft v. Seward, 689 F.2d 637, 639-40 (6th Cir. 1982) and Buder v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 644 F.2d 690, 694 (8th Cir. 1981)).

. Id.

. 31 U.S.C. § 3729(a)(1)(G) (2009).

. Pub. L. No. 111-21, 123 Stat. 1617 (2009).

. 31 U.S.C. § 3729(a)(7) (1994) (emphasis added).

. Id.

. 31 U.S.C. § 3729(a)(1)(G) (2009).

. 31 U.S.C. § 3729(b)(3) (2009).

. See 190 F.3d 729, 736 (6th Cir. 1999).

. Id. at 735 (quoting United States v. Q Int'l Courier, Inc., 131 F.3d 770, 773 (8th Cir. 1997)).

. S. Rep. 111-10, at 14 (2009).

. Id. (internal quotation marks omitted).

. Id. at 14 n. 10.

. Id.

. See 19 U.S.C. § 1304(a), (c), (i).

. Id. § 1304(1).

, Id.

. 31 U.S.C. § 3729(a)(1)(G) (emphasis added).

. Compare id. with 31 U.S.C. § 3729(a)(7) (1994).

. See 31 U.S.C. § 3729(a)(7) (1994); see also ATMI, 190 F.3d at 736.

. 31 U.S.C. § 3729(a)(1)(G).

. Given that here, § 1484 requires importers to disclose to CBP that goods are improperly marked, we have no need to address how, if at all, the FCA would apply in the absence of an affirmative obligation to disclose separate from the obligation to pay or transmit money or property to the government.

. Rule 8(a)(2) provides that a complaint must contain "a short and plain statement of the claim—”

. Rule 9(b) provides that in "alleging fraud ..., a party must state with particularity the circumstances constituting fraud ...”

. See, e.g., Iqbal, 556 U.S. at 678, 129 S.Ct. 1937.

. JA 311, 313.

. JA 304.

. Id.

. JA 317.

. Id.

. JA 318.

. JA 317.

. JA 318.

. JA 305 (emphasis added).

. JA 304.

. JA 316.

. This result differs from that, for example, in Burgis v. New York City Department of Sanitation, 798 F.3d 63 (2d Cir. 2015), in which plaintiffs alleged that the sanitation department was discriminating against employees based on race. The Second Circuit held that statistics could sufficiently allege discriminatory intent as long as they are of "a level that makes other plausible non-discrimi-hatory explanations very unlikely.” Id. at 69. The statistics there showed only that a majority of employees at multiple levels of the sanitation department were white, but showed nothing about “the qualifications of individuals in the applicant pool and of those hired for each position, or the number of openings at each level.” Id, at 70. Our case is not analogous because among other things we have a baseline here that was missing in Bur-gis—between 54% and 91% of the entirety of Victaulic pipefittings should have foreign origin markings,

. Foglia v. Renal Ventures Mgmt., LLC, 754 F.3d 153, 157-58 (3d Cir. 2014)

. Id. at 158.

.Chief Justice John Roberts, “2015 Year-End Report on the Federal Judiciary,” Dec. 31, 2015 (Roberts Report), at 4, available at http://www.supremecourt.gov/publicinfo/year-end/2015year-endreport.pdf.

. Id. at 5.

. Id. at 7.

. Id. at 10.