PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 17-2471

_____


CITY OF CAMBRIDGE RETIREMENT SYSTEM, On
behalf of
itself and all others similarly situated, et al.

v.

ALTISOURCE ASSET MANAGEMENT CORP; WILLIAM
C. ERBEY;
KENNETH NAJOUR; ASHISH PANDEY; ROBIN LOWE,

Denver Employee Retirement Plan,
                                        Appellant

_____


On Appeal from the District Court
of the Virgin Islands
(D.C. No. 1-15-cv-00004)
District Judge:  Honorable Harvey Bartle, III

_____

Argued May 24, 2018

Before:  KRAUSE, ROTH and FISHER, *Circuit Judges*.


(Filed: November 14, 2018)

Steve W. Berman, Esq.
Hagens Berman Sobol Shapiro
1301 2nd Avenue, Suite 2000
Seattle, WA 98101

Vincent A. Colianni, II, Esq.
Colianni & Colianni
1138 King Street
Christiansted, VI 00820

Kevin K. Green, Esq.  [ARGUED ]
Hagens Berman Sobol Shapiro
533 F Street, Suite 207
San Diego, CA 92101
         *Counsel for Appellant*


Walter C. Carlson, Esq.  [ARGUED]
Sidley Austin
One South Dearborn Street
Chicago, IL 60603

Chad C. Messier, Esq.
Dudley Topper & Feuerzeig
1000 Frederiksberg Gade

P.O. Box 756
St. Thomas, VI 00804

David S. Petron, Esq.
Sidley Austin
1501 K Street, N.W.
Washington, DC 20005

    *Counsel for Appellee Altisource Asset Management Corp*

John L. Hardiman, Esq.

Julia A. Malkina, Esq.
Sullivan & Cromwell
125 Broad Street
New York, NY 10004

    *Counsel for Appellee William C. Erbey*

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

    Commenting on the economic calamity that was the South Sea Bubble—in which he lost a considerable fortune—Sir Isaac Newton is said to have remarked, "I can calculate the motions of the heavenly bodies, but not the madness of the

3

people."[1] Throughout its history, the trade of public securities has proven to be both a powerful engine of economic growth and an occasionally harsh reminder that what goes up must come down.

In this securities fraud class action, former shareholders allege that Altisource Asset Management Corporation and several of its officers (collectively AAMC) inflated the price of its stock through false and misleading statements. When these mistruths were revealed to the market, the allegation goes, the price of AAMC's stock plummeted, costing shareholders billions of dollars. The District Court dismissed the complaint for failure to state a claim, concluding that Plaintiffs failed to satisfy the requirements of the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u–4. We agree and affirm.

I

A. Factual Background[2]

*1. William Erbey and Ocwen Financial*

AAMC is one of several independent, but affiliated, companies founded by William Erbey. The first company, Ocwen Financial, was created in 1988 and became the country's largest purchaser of non-performing mortgage loans in the 1990s. Companies earn profit from non-performing mortgages by either efficiently foreclosing on the underlying

---

[1] Edward Chancellor, *Devil Take the Hindmost* 69 (1999). The earliest accounts of Newton's comment vary slightly. *See* Joseph Spence, *Anecdotes, Observations, and Characters* 368 (Samuel Singer, ed., 1820).

[2] This factual background, unless otherwise indicated, is taken from the operative complaint and accepted as true. *Krieger v. Bank of Am., N.A.*, 890 F.3d 429, 434 (3d Cir. 2018).

4

properties or by bringing the loans to current status. Once current, the mortgages can either provide a reliable stream of income or be resold at a premium. Ocwen came to specialize in the servicing of non-performing loans. Mortgage servicing is essentially a specialized form of debt collection, but in the context of non-performing mortgages it is a notoriously difficult and labor-intensive task. Ocwen gradually transitioned from primarily servicing its own loans to acquiring mortgage servicing rights from others. Large mortgage holders sometimes contract with third parties for loan servicing, typically paying the servicer a fee based on the unpaid principal balance of the serviced properties. Business was thin for Ocwen during the housing boom of the late 1990s and early 2000s because rising property values limited the number of non-performing mortgages. The large banks, which owned a majority of U.S. mortgages, were generally able to manage their own (comparatively few) non-performing loans.

The 2008 housing crisis changed this picture. As droves of borrowers fell behind on their mortgages, the largest mortgage holders found themselves ill-equipped to service the ballooning number of delinquent, non-performing loans. This led to widespread corner-cutting—e.g., robo-signing of foreclosure documents, fraudulent affidavits, and other abusive servicing practices—which culminated in the 2012 National Mortgage Settlement. Under this agreement, the nation's five largest mortgage holders, all banks, agreed to provide more than $50 billion worth of relief to mistreated homeowners. *What was the National Mortgage Settlement?*, Consumer Fin. Prot. Bureau (updated May 10, 2018), perma.cc/CA8Z-E8HC.

In this environment, Ocwen's experience in servicing non-performing mortgages proved exceptionally advantageous—and profitable. As banks sought to avoid the financial hazards and regulatory scrutiny of servicing non-

5

performing and sub-prime loans, Ocwen was there to buy up staggering quantities of mortgage servicing rights. From 2009 to 2013, Ocwen's servicing portfolio grew from approximately 350,000 properties to more than 2.8 million. Consent Order Pursuant to New York Banking Law § 44 at 2, *In the Matter of Ocwen Fin. Corp.*, N.Y. Dep't Fin. Servs. (Dec. 22, 2014), perma.cc/26XF-VMM2 (hereinafter the 2014 DFS Consent Order). The aggregate unpaid principal balance of the properties Ocwen serviced correspondingly grew from $50 billion to more than $464 billion. *Id.* By the end of 2013, Ocwen had become the fourth largest mortgage servicer in the U.S., and the largest servicer of sub-prime loans. *Id.* at 1. In addition to efficiently servicing and foreclosing on distressed properties, Ocwen also led the industry with programs designed to help underwater borrowers stay in their homes. *See* Patricia A. McCoy, *Barriers to Foreclosure Prevention During the Financial Crisis*, 55 Ariz. L. Rev. 723, 763–64 (2013). Ocwen's willingness to expand its role in the mortgage industry made it attractive to investors looking for opportunities to re-enter the market following the 2008 crisis.

Ocwen's growth and success did not pass without notice, however. When Ocwen sought to acquire yet another large portfolio of mortgage servicing rights in 2011, the New York Department of Financial Services (DFS) raised concerns about Ocwen's growth and scalability. As a condition of DFS approval for the acquisition, Ocwen agreed to abide by a detailed set of servicing and staffing standards. *Agreement on Mortgage Servicing Practices*, N.Y. Dep't Fin. Servs. (Sep. 1, 2011), perma.cc/M6JW-XEET (hereinafter the 2011 DFS Agreement). The following year, DFS conducted "a targeted examination" of Ocwen, which "identified gaps in the servicing records of certain loans that . . . indicate[d] non-compliance" with the 2011 agreement. Consent Order Pursuant

6

to New York Banking Law § 44 at 2–3, *In the Matter of Ocwen Loan Serv., LLC*, N.Y. Dep't Fin. Servs. (Dec. 5, 2012), perma.cc/5FA8-7SCG (hereinafter the 2012 DFS Consent Order). As a result, DFS and Ocwen entered into the 2012 consent order, which required Ocwen to install an independent, on-site monitor to ensure compliance with the 2011 agreement. *Id.* at 4. These regulatory actions did not appear to hinder Ocwen's financial health, however, as the company's stock nearly doubled in the six months following the 2012 order.

### 2. The Ocwen Spin-offs

Also in December 2012—and directly relevant to this case—Ocwen completed the spin-off of several independent companies related to its core mortgage servicing business. Those companies were Altisource Portfolio Solutions (ASPS), Altisource Residential Corporation (RESI), and the appellee, Altisource Asset Management Corporation (AAMC).[3] As explained and depicted below, each of these spin-offs—in conjunction with Ocwen—would work together to profit from various opportunities within the broader real estate market.

Organizational Chart as of December 31, 2012

---

[3] AAMC and RESI were not spun-off from Ocwen directly. ASPS was spun-off from Ocwen in 2009, and in 2012 AAMC and RESI were both spun-off from ASPS.

7



RESI was created to capitalize on the nationwide decline in home ownership and the consequent increase in demand for rental properties. RESI would acquire non-performing loans, with Ocwen providing the loan servicing. If the mortgage could be brought current, RESI would sell the loan for a profit. If not, RESI would foreclose on the home, take title, and maintain it as a rental property, with property management services provided by ASPS. This strategy for converting non-performing loans into rental properties—if

8

performed efficiently—offered significant financial savings over the conventional approach of purchasing such properties at foreclosure auctions. RESI had no employees, and received asset management and corporate governance services from AAMC, which itself had only seven employees. RESI—AAMC's only client—paid AAMC a management fee based on RESI's available assets. Overall, the Ocwen-affiliated companies were highly interrelated and shared a significant number of corporate officers. For each company, William Erbey was the largest individual shareholder and served as Chairman of the Board.

At first, it appeared as if Erbey and his passel of affiliated companies could do no wrong, and the stock price of each company enjoyed a meteoric rise. AAMC, in particular, began 2013 trading at around $75 per share, but by January 2014 had risen as high as $1,196 per share. Only one year later, however, AAMC had fallen to $160 a share. Each of the other Ocwen companies suffered a similar fate. The claims period in this case—April 19, 2013 through January 12, 2015—includes the bulk of this precipitous rise and fall, which resulted, at least in part, from the persistent regulatory actions taken against Ocwen during the same time period.

### 3. Regulatory Pressure

By December 2013, Ocwen was the largest non-bank mortgage servicer in the U.S. On December 19, 2013, Ocwen entered into a consent order with the Consumer Financial Protection Bureau (CFPB) and authorities in 49 states and the District of Columbia. Consent Judgment, *Consumer Fin. Prot. Bureau v. Ocwen Fin. Corp.*, No. 13-cv-2025 (D.D.C. Dec. 19, 2013), perma.cc/5KZP-MW6R (hereinafter the 2013 CFPB Consent Order). A CFPB investigation of Ocwen had uncovered systemic consumer protection violations, largely

attributed to Ocwen's breakneck acquisition of mortgage servicing rights in the preceding years. Pursuant to the 2013 CFPB consent order, Ocwen agreed to refund over $125 million to borrowers who had been wrongfully foreclosed upon and to provide $2 billion in principal reduction to underwater homeowners. *Id.* at 9–10. Ocwen also agreed to abide by the standards outlined in the National Mortgage Settlement, *id.* at 9, becoming the first non-bank to do so.

Throughout 2014, Ocwen and its affiliates also attracted more scrutiny from DFS and other government actors. In February, DFS halted a proposed $2.7 billion sale of mortgage servicing rights to Ocwen from Wells Fargo. Second Amended Complaint (SAC) ¶ 164. DFS also sent a public letter to Ocwen voicing its concern with "potential conflicts of interest" between the Ocwen-related companies. Letter from Benjamin M. Lawsky, Superintendent, N.Y. Dept. of Fin. Servs., to Timothy Hayes, General Counsel, Ocwen Fin. Corp. (Feb. 26, 2014), perma.cc/5C52-ZPJ9 (hereinafter the 2014 DFS Letter). And later in the year, the Department of Housing and Urban Development (HUD) shut RESI out of a government-sponsored auction of distressed properties. SAC ¶ 166.

In December 2014, Ocwen entered into yet another consent order with DFS, precipitated by the findings of the compliance monitor installed under the 2012 consent order. 2014 DFS Consent Order at 2. The monitor identified several significant servicing violations by Ocwen, including (1) failing to confirm that it had the right to foreclose before initiating foreclosure proceedings, (2) failing to ensure that its representations during foreclosure proceedings were correct, (3) pursuing foreclosure while loan modification applications were pending, and (4) failing to ensure that no foreclosure actions were pursued against active duty servicemembers. *Id.* at 5–6. As had the CFPB, the DFS compliance monitor traced

10

many of these problems to widespread technological deficiencies in Ocwen's servicing platform. As Ocwen acquired companies and loan portfolios, it also inherited the myriad proprietary computer systems used to service those loans. *Id.* at 6–7. Ocwen's efforts to combine these legacy systems had resulted in a number of incompatibilities that produced incorrect or outdated loan information. *Id.* The monitor also identified several conflicts of interest among the Ocwen-affiliated companies, specifically finding that Erbey had not recused himself from several transactions between Ocwen and ASPS, resulting in higher costs for Ocwen. *Id.* at 9. Pursuant to the 2014 DFS consent order, Ocwen agreed to pay $150 million in relief to New York homeowners, and Erbey agreed to resign his positions at Ocwen, ASPS, RESI, and AAMC. *Id.* at 10, 17–18.

None of the above-mentioned regulatory actions were brought against AAMC, nor did any action identify improper conduct by Erbey relative to his role at AAMC.

## B. Procedural History

The initial complaint in this class action was filed on January 16, 2015 by City of Cambridge Retirement System. After being appointed as lead plaintiff, Denver Employees Retirement Plan filed a significantly revised amended

11

complaint, which it captioned its "Consolidated Complaint."[4] AAMC filed a motion to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), which the District Court granted. Roughly three weeks later, Plaintiffs sought leave to reopen the case and further amend the complaint, attaching a proposed second amended complaint to its motion. After considering the proposed complaint, the District Court denied leave to amend as futile. Plaintiffs then filed this timely appeal.

II

The District Court had jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 78aa. We have jurisdiction under 28 U.S.C. § 1291. Generally, a district court's denial of leave to amend is reviewed for abuse of discretion. *United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242, 248–49 (3d Cir. 2016). Leave to amend is properly denied if amendment would be futile, i.e., if the proposed complaint

---

[4] Plaintiffs continue to contend that the District Court should not have counted the "Consolidated Complaint" as an amended complaint. This contention is both wrong and irrelevant. There were not—as is frequently the case—multiple complaints in need of consolidation, so the only purpose of the revised complaint was to make substantive amendments. In any event, because the District Court dismissed due to futility, the number of prior opportunities Plaintiffs had to amend is immaterial. *See In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 280 & n.12 (3d Cir. 2004) (affirming denial of leave to amend because proposed second amended complaint was futile); *United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242, 252 (3d Cir. 2016) (suggesting that denial of leave to amend the initial complaint would have been justified if the proposed amendment would have been futile).

could not "withstand a renewed motion to dismiss." *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 292 (3d Cir. 1988). "In assessing 'futility,' the district court applies the same standard of legal sufficiency as applies under Rule 12(b)(6)." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997). And as to this legal determination, our review is plenary. *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013).

In determining whether Plaintiffs' proposed second amended complaint states a claim under Rule 12(b)(6), we accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the plaintiff. *Id.* However, "we disregard threadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements." *James v. City of Wilkes-Barre*, 700 F.3d 675, 681 (3d Cir. 2012).

## III

### A. The Elements of a Rule 10b–5 Claim

The proposed complaint charges AAMC with securities fraud in violation of § 10(b) of the Securities Exchange Act of 1934, 48 Stat. 881, 15 U.S.C. § 78j, and Securities and Exchange Commission (SEC) Rule 10b–5, 17 C.F.R. § 240.10b–5.[5] The 1934 Act prohibits the use of "any manipulative or deceptive device" in connection with "the purchase or sale of any security registered on a national securities exchange." 15 U.S.C. § 78j(b). More specifically, Rule 10b–5 makes it unlawful for any person—in connection with the sale of any security—"[t]o make any untrue statement

---

[5] Plaintiffs' proposed complaint also alleges that AAMC violated § 20(a) of the Securities Exchange Act of 1934. They do not discuss this allegation on appeal, and we do not consider it in reaching our conclusion.

of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). To state a claim under Rule 10b–5, a plaintiff must allege:

> (1) a material misrepresentation (or omission);
>
> (2) scienter, i.e., a wrongful state of mind;
>
> (3) a connection with the purchase or sale of a security;
>
> (4) reliance;
>
> (5) economic loss; and
>
> (6) loss causation . . . .

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005) (internal quotation marks, citations, and emphasis omitted). In this case—and as is typical—the principal contentions relate to only three elements: a material misrepresentation (or omission), scienter, and loss causation. *See Cal. Pub. Emps. Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 143 (3d Cir. 2004).

In addition to Rule 12(b)(6), pleadings in Rule 10b–5 actions must also satisfy the particularity requirements of both Rule 9(b) and the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u–4. *Id.* Rule 9(b) provides that any fraud allegation "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The PSLRA prescribes yet greater particularity relative to the elements of material misrepresentation and scienter. With respect to material misrepresentation, the PSLRA requires that a complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation . . . is made on information and belief, . . . all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). With respect to scienter, complaints

14

must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u–4(b)(2)(A).[6]

Far from mere technicalities, enforcement of such pleading requirements helps avoid the "abusive" practice of plaintiffs with "largely groundless claim[s] . . . simply tak[ing] up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value." *Dura*, 544 U.S. at 347 (first quoting H.R. Rep. No. 104–369, at 31 (1995) (Conf. Rep.); then quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 741 (1975)). To that end, the PSLRA seeks "to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Allowing claims only in cases of true fraud avoids converting private securities actions into "a partial downside insurance policy" against the vicissitudes of the market. *Dura*, 544 U.S. at 347–48.

### B. Plaintiffs' Claims

Plaintiffs base their fraud claims on two principal classes of statements made by AAMC. First, Plaintiffs argue that AAMC misrepresented the benefits attributable to its relationship with Ocwen. For example, in its 2012 Annual Report filed with the SEC, AAMC stated:

---

[6] Because the District Court ruled on futility grounds alone, remand would be appropriate if we were to determine that the complaint suffered only from a lack of particularity. *Burlington Coat Factory*, 114 F.3d at 1435. However, because we conclude that the complaint "would not survive a Rule 12(b)(6) motion even if pled with more particularity," no remand is necessary. *Id.*

> [W]e believe that [RESI's] access to Ocwen's servicing expertise helps it to maximize the value of its loan portfolios and provides it with a competitive advantage over other companies with a similar focus.

J.A. 275. Plaintiffs allege that this statement was "materially false and misleading because [it] portrayed Ocwen as a benefit and a 'competitive advantage' to RESI, when Ocwen was neither," SAC ¶ 138, because of its outdated servicing platform and regulatory violations.

The second category of alleged misrepresentations concerns AAMC's stated policy of requiring its officers—Erbey in particular—to recuse themselves from any transactions involving other Ocwen-affiliated companies. In its 2013 Annual Report, AAMC stated:

> Each of our executive officers is also an executive officer of [RESI] and has interests in our relationship with [RESI] that may be different than the interests of our stockholders. . . . We follow policies, procedures and practices to avoid potential conflicts with respect to our dealings with [ASPS], Ocwen and [RESI], including our Chairman [Erbey] recusing himself from negotiations regarding, and approvals of, transactions with these entities . . . .

J.A. 324. Plaintiffs allege that this disclosure was "false and misleading because it omits to disclose that the Related-Party Transaction Policy was widely disregarded by Defendant Erbey and others." SAC ¶ 144.

The District Court concluded that Plaintiffs' allegations failed to plausibly allege either a material false statement or

16

loss causation. It did not reach the question of scienter, but on appeal AAMC has renewed its argument that the complaint should fail on that basis as well. The following sections will analyze whether either class of alleged misrepresentations by AAMC is sufficient to survive a challenge under Rule 12(b)(6) and the PSLRA.[7] With regard to the statements concerning AAMC's relationship with Ocwen, we conclude that Plaintiffs have not plausibly alleged that the statements were false, and, therefore, we need not determine whether Plaintiffs sufficiently pled scienter or loss causation. With regard to AAMC's recusal policy, we conclude that Plaintiffs' failure to identify a single AAMC transaction in which Erbey—or some other officer—improperly participated renders its allegations too speculative to meet the PSLRA's strict requirements.

### 1. Falsity

The complaint contains dozens of statements from various Ocwen-affiliated companies—not only, or even primarily, AAMC—that Plaintiffs characterize as material misrepresentations. On the question of falsity, then, the first issue to address is the legal significance of statements made by companies other than AAMC. Rule 10b–5 makes it unlawful for any person to "make any untrue statement of a material fact," 17 C.F.R. § 240.10b–5(b), and, with regard to this rule, "the maker of a statement is the person or entity with ultimate authority over the statement," *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). Therefore, in considering whether AAMC made any material

---

[7] In general, a complaint that satisfies the PSLRA's heightened pleading standards will also satisfy Rule 9(b)'s requirements.

17

misrepresentations, we will consider only the statements of AAMC (and not RESI, Ocwen, or other affiliated companies).

*i. Statements Concerning AAMC's Relationship with Ocwen*

As detailed above, Ocwen underwent significant regulatory scrutiny before, during, and after the claims period, and multiple regulatory bodies sanctioned it for improper servicing practices. In various filings and public statements, AAMC described its relationship with RESI and, in turn, RESI's relationship with Ocwen. Plaintiffs allege that (1) AAMC knew that Ocwen's servicing platform was severely flawed and therefore a detriment to AAMC, and (2) AAMC's failure to disclose this information about Ocwen constituted a material omission.

AAMC provided a detailed explanation of its relationship with Ocwen in its 2013 Annual Report under the heading "Risks Related to Our Management and Our Relationships with [ASPS], Ocwen, and [RESI]":

> [RESI] is contractually obligated to service the residential mortgage loans that it acquires. [RESI] does not have any employees, servicing platform, licenses or technical resources necessary to service its acquired loans. Consequently, [RESI] has engaged Ocwen to service the non-performing and sub-performing . . . loans it acquires. If for any reason Ocwen is unable to service these loans at the level and/or the cost that [RESI] anticipates, . . . an alternate servicer may not be readily available on favorable terms, or at all, which could have a material adverse effect on [RESI].

J.A. 323, 324. Thus, the annual report explained that RESI depended on Ocwen for loan servicing and would be at risk if it needed to find a different servicer. The same report also made clear that, because RESI was AAMC's sole source of revenue, any risk to RESI applied in equal measure to AAMC. J.A. 309–10.

Plaintiffs argue that, in order to make this report (and others like it) not misleading, AAMC was obligated to disclose its awareness of problems with Ocwen's servicing platform. But in the context in which these statements were made, there was nothing false or misleading about AAMC's assertions. The above-quoted report does not imply anything about the *quality* of Ocwen's loan servicing, only its capacity (high) and its cost (low). Plaintiffs have not alleged that AAMC had any reason to believe that Ocwen, whatever its flaws, would be unable to service all of the loans RESI sent its way. Nor is there any allegation that Ocwen ever did fail to meet its servicing obligation to RESI. Given that context, there was nothing misleading about AAMC's disclosed reliance on Ocwen. By contrast, suppose AAMC knew at the time of this report that Ocwen would soon be unable to take on any additional mortgage servicing rights obligations. In that case, AAMC's

19

statement would be misleading because what it identified as a possible risk, was, in truth, known to be imminent.[8]

In effect, Plaintiffs suggest that AAMC's reference to Ocwen carried some form of implied warranty. Plaintiffs exhaustively catalogue Ocwen's regulatory violations, but cite no authority to support the conclusion that AAMC was obligated to disclose the flaws of a separate entity in its own filings. Even assuming that such an obligation could arise in some cases, it would make no sense to impose such a requirement where, as here, the allegedly "concealed" information—Ocwen's regulatory failures—was not only well-known, but typical of most mortgage servicers at the time. McCoy, *supra*, 55 Ariz. L. Rev. at 748 (noting a 2011 Treasury Department investigation, which concluded that each of the ten largest servicers in the Home Affordable Modification Program was deficient); Vincent Di Lorenzo, *Corporate Wrongdoing: Interactions of Legal Mandates and Corporate Culture*, 36 Rev. Banking & Fin. L. 207, 226 (2016)

---

[8] The complaint highlights other AAMC statements praising Ocwen, e.g., "We intend to capitalize on the servicing capabilities of Ocwen, which we view as superior relative to other servicers in terms of cost, management experience, technology infrastructure and platform scalability." SAC ¶ 136. Such statements are not false because they clearly convey a subjective opinion. Moreover, we have consistently held that such "vague and general statements of optimism" are non-actionable precisely because they are not material, i.e., a reasonable investor would not base decisions on such statements. *See In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538–39 (3d Cir. 1999), *abrogated on other grounds as recognized by Inst. Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 276 (3d Cir. 2009).

(describing mortgage servicing as a "distinct industry-wide example of improper conduct," and discussing a 2015 Comptroller of the Currency investigation, which found repeated noncompliance with servicing standards by several parties to the 2012 National Mortgage Settlement); *see generally* Matthew Goldstein, Rachel Adams, & Ben Protess, *How Housing's New Players Spiraled Into Banks' Old Mistakes*, N.Y. Times, June 26, 2016, goo.gl/GoYTqv.

Under Rule 10b–5, the misleading nature of a statement is evaluated "in the light of the circumstances under which" it is made. 17 C.F.R. § 240.10b–5(b). As was clear under these circumstances, AAMC's statements about Ocwen were relevant only insofar as RESI—and, by extension, AAMC—depended on Ocwen to service the mortgages it acquired. AAMC had no reason to believe that Ocwen would be unable to fill this role, so its statements to this effect were not misleading.

### ii. Statements Concerning AAMC's Recusal Policy

AAMC claimed in various disclosures that it had "policies, procedures and practices" to avoid potential conflicts with respect to the other Ocwen-affiliated companies. J.A. 324. In particular, these policies required Erbey to "recus[e] himself from negotiations regarding, and approvals of, transactions with" those companies. *Id.* Plaintiffs allege that these statements were false and misleading because, in reality, Erbey had not recused himself from decisions concerning several related-party transactions. To support this allegation, the complaint primarily relies on a 2015 cease-and-desist order issued by the SEC, which concluded that Erbey had failed to recuse himself from certain transactions between Ocwen and another affiliated company, HLSS. According to Plaintiffs, this finding "raises a strong inference that [the defendants] acted in

21

a similar manner with respect to AAMC." SAC ¶ 145; *see id.* at ¶ 107 (quoting *In the Matter of Home Loan Serv. Sols., Ltd.*, SEC Release No. 3713, 2015 WL 5782427, at *1–2 (Oct. 5, 2015)).

By their own admission, Plaintiffs' allegation regarding AAMC's recusal policy relies on an inference from Erbey's conduct with regard to two separate companies. Even accepting that the stringent pleading requirements applicable to Rule 10b–5 actions should be "relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control," *Burlington Coat* Factory, 114 F.3d at 1418, we cannot credit factual allegations, such as this, which do not rise "above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). By not identifying a single AAMC transaction in which Erbey improperly participated, the complaint attempts to establish falsity through the very sort of "speculative fraud by hindsight that the [PSLRA] was intended to eliminate." *In re Rockefeller Ctr. Properties, Inc. Sec. Litig.*, 311 F.3d 198, 225 (3d Cir. 2002).

\*

Plaintiffs allege that AAMC misrepresented both the benefits of its relationship with Ocwen and its adherence to a recusal policy designed to protect against conflicts of interest. However, Plaintiffs have failed to sufficiently plead falsity as to either category. The statements concerning AAMC's relationship with Ocwen were not misleading in the context in which they were made because AAMC's reliance on Ocwen only extended to its ability to service the loans acquired by AAMC. Likewise, the complaint does not plausibly allege that AAMC's statements about its recusal policy were false or misleading. Instead, it simply speculates that Erbey must have violated the AAMC recusal policy because he is suspected to

have done so with other companies. Neither allegation satisfies the PSLRA's strict standards for stating a claim.

## 2. *Scienter and Loss Causation*

Even if Plaintiffs had sufficiently alleged that AAMC made false or misleading statements, this alone would not be enough to survive a motion to dismiss. Plaintiffs must also plead facts sufficient to create a "strong inference" that AAMC intended to defraud shareholders (scienter), 15 U.S.C. § 78u–4(b)(2)(A), and adequately allege that, when the truth was revealed about those fraudulent statements, Plaintiffs suffered an economic harm as a result (loss causation), *Dura*, 544 U.S. at 341-42. Both factors are predicated upon a sufficient pleading of false or misleading statements. Because we hold that Plaintiffs failed to satisfy this first requirement, we decline to go so far as to postulate whether AAMC may have intended to defraud shareholders with non-fraudulent statements. Nor do we speculate whether statements made—that do not correct or contradict misleading statements by AMMC—could reasonably have caused economic harm to Plaintiffs. Instead, we conclude our analysis at our finding of no falsity and hold that Plaintiffs have not stated a claim upon which relief can be granted.

## IV

The economic harm suffered by AAMC's investors is certainly regrettable, but Plaintiffs fail to plausibly allege that this harm arose from fraud. When a stock experiences the rapid rise and fall that occurred here, it will not usually prove difficult to mine from the economic wreckage a few discrepancies in the now-deflated company's records. *See* H.R. Rep. No. 104–369, at 31 (1995) (Conf. Rep.). Hindsight, however, is not a cause of action. In passing the PSLRA, Congress concluded that the very stability of our capital

23

markets depends on forestalling meritless suits while preserving for "defrauded investors" the "indispensable tool" of private litigation. *Id.* Because Plaintiffs' complaint falls on the wrong side of this carefully-struck balance, we will affirm the decision of the District Court.